## IN THE UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

| | |
|---|---|
| BASED POLITICS INC., <br><br> Petitioner, <br><br> v. <br><br> MERRICK GARLAND, *in his official capacity as Attorney General of the United States*, <br><br> Respondent. | No. 24-1183 |

## PETITION FOR REVIEW
## OF THE CONSTITUTIONALITY OF THE
## PROTECTING AMERICANS FROM FOREIGN ADVERSARY
## CONTROLLED APPLICATIONS ACT

## INTRODUCTION

1. TikTok is a social media platform on which millions of Americans publish and consume *speech*. Some of that speech might be considered frivolous—such cat videos, trendy dances, or people lip syncing to popular songs. But much of the speech on TikTok is serious, addressing important political and social issues. And all of it is protected by the First Amendment.

2. Petitioner BASED Politics Inc. is a nonprofit organization established in part to reach Gen Z with educational content and commentary from a perspective that favors free markets and individual liberty.

3. Its founders, Hannah Cox and Brad Polumbo, use TikTok to communicate with that audience, including thousands of young people who otherwise would never hear their message. Their videos on topics such as systemic racism, the gender pay gap, economics, and free speech typically receive thousands of views—some hundreds of thousands, and some more than a million.

4. Their use of TikTok also allows them to engage with their audience, receiving feedback and debating ideas raised in their videos.

5.  Now, however, the federal government has enacted a law that will shut down TikTok—and, with it, the ability of BASED Politics to reach its audience with its message—unless this Court enjoins its enforcement.

6.   This is a petition for review of that statute, the Protecting Americans from Foreign Adversary Controlled Applications Act ("the Act"), Pub. L. No. 118-50, Div. H (Apr. 24, 2024), attached to this Petition as Exhibit 1.

7.  Petitioner asks this Court to declare the statute unconstitutional and enjoin the Respondent, Attorney General Merrick Garland, from enforcing it. An injunction against the Act is essential to prevent irreparable harm to the First Amendment rights of Petitioner and the millions of other Americans who use TikTok to publish and consume protected speech.

## PARTIES

8.  Petitioner Based Politics Inc. is a Georgia 501(c)(3) nonprofit organization that publishes educational content on free markets and individual liberty, including, among other things, articles, podcasts,

social media posts, and TikTok videos by its founders, Hannah Cox and

Brad Polumbo.

9.  Respondent Merrick Garland is the United States Attorney

General, charged by the Foreign Adversary Controlled Applications Act

with the statute's enforcement.

## JURISDICTION AND VENUE

10.    This Court has original jurisdiction over this matter under

Section 3(a)-(b) of the Foreign Adversary Controlled Applications Act,

which provides that all challenges to that Act must be brought in this

Court.

11.    This Court also has authority under the Declaratory

Judgment Act, 28 U.S.C. § 2201(a), to decide this action and award

relief because the action presents an actual case or controversy within

the Court's original jurisdiction.

## FACTUAL ALLEGATIONS

**TikTok**

12.    TikTok is an online video hosting platform on which users can

publish and view videos that typically range in length from 15 seconds to

three minutes.

13.     More than 170 million Americans use TikTok to publish and consume speech, including political speech.

14.     More Americans use TikTok than Pinterest, LinkedIn, Snapchat, X (formerly Twitter), Discord, Threads, Truth Social, or Mastodon. Brian Fung, *Biden Just Signed a Potential TikTok Ban Into Law. Here's What Happens Next,* CNN, April 24, 2024.[1]

15.     TikTok's algorithm shows each user an ongoing selection of curated videos on their "For You" page feed.

16.     This system gives each TikTok user his or her own unique feed of videos selected by TikTok's algorithm, based on the user's reactions to and engagement with other videos the user has seen on the platform.

17.     In this way, TikTok's algorithm allows users to find content they might not actively search for, which can allow TikTok content creators to more easily reach an interested audience.

18.     TikTok is owned by ByteDance Ltd., a company incorporated in the Cayman Islands and headquartered in Beijing, China.

---

[1] https://www.cnn.com/2024/04/23/tech/congress-tiktok-ban-what-next/index.html (last accessed May 27, 2024)

**Petitioner's Use of TikTok for Speech**

19.     Petitioner BASED Politics Inc. is a 501(c)(3) nonprofit organization established in part to reach Gen Z with social media content that promotes free markets and individual liberty. BASED Politics publishes its content on various internet platforms, including TikTok.

20.     BASED Politics President and co-founder Hannah Cox relies on TikTok to bring the organization's message to viewers who are not otherwise accessible on other social media platforms. Her TikTok account has amassed some 43,000 followers, and her TikTok videos on topics including systemic racism and the gender pay gap have reached hundreds of thousands, and even as many as one million, people at a time.

21.     BASED Politics co-founder Brad Polumbo, a journalist, uses TikTok on the organization's behalf to publish educational videos on topics ranging from higher education to economics to free speech. He has accumulated more than 15,000 followers, and his videos received more than 1.5 million views from April 4 to June 4, 2024 alone.

22.     The TikTok algorithm has introduced BASED Politics content to thousands of unique individuals who likely never would have heard its

message anywhere else because many members of Gen Z get news exclusively from TikTok.

23.    TikTok's unique content curation algorithm affords Petitioner an opportunity to reach an audience that it could not reach on other social media platforms—both because TikTok has users who do not use the other platforms, and because some TikTok audience members would not seek out or otherwise see BASED Politics content when using other platforms.

24.    Petitioner's reach on TikTok is a direct result of TikTok's proprietary content curation algorithm.

25.    Many TikTok users have used TikTok to send Cox and Polumbo messages or comments of support, or to engage in debate about their videos.

**The Foreign Adversary Controlled Applications Act**

26.    On April 24, 2024, President Biden signed into law The Foreign Adversary Controlled Applications Act, H.R. 815, 118th Cong. (2024) (the "Act")—a statute that effectively bans TikTok in the United States.

27.     The Act makes it unlawful to "provid[e] services to distribute, maintain, or update" a "foreign adversary controlled application" "within the land or maritime borders of the United States," by either of two ways. Act § 2(a)(1)(A).

28.     First, the Act makes it illegal to distribute, maintain, or update a "foreign adversary controlled application" by "providing services to distribute, maintain, or update such" applications "by means of a market place (including an online mobile application store) through which users within the land or maritime borders of the U.S. may access, maintain, or update [it]." *Id.*

29.     Thus, for example, the Act would make it unlawful for the Apple Store to allow users to download and update a foreign adversary controlled application.

30.     Second, the Act makes it illegal for a website hosting service to host data for a "foreign adversary controlled application." *Id.* at § 2(a)(1)(B).

31.     The Act provides that TikTok may continue to operate if ByteDance makes a "qualified divestiture" of the platform within 270 days of the Act's enactment—that is, by January 19, 2025. *Id.* § 2(c)(1).

32.     The Act defines a "qualified divestiture" to include "a divestiture or similar transaction" that the President determines, through an interagency process, (A) "would result in [TikTok] no longer being controlled by a foreign adversary" and (B) "precludes the establishment or maintenance of any operational relationship between the United States operations of [the platform] and any formerly affiliated entities that are controlled by a foreign agency, including any cooperation with respect to the operation of a content recommendation algorithm or an agreement with respect to data sharing." *Id.* § 2(g)(6).

33.     In other words, the Act provides that app stores may only continue to allow access to TikTok, and U.S. hosting services may only host TikTok, if its current owners sell it to an entity not controlled by a "foreign adversary" by January 19, 2025.

34.     That deadline is subject to a single extension of 90 days if the President certifies to Congress that "(A) a path to executing a qualified divestiture has been identified with respect to [the] application"; "(B) evidence of significant progress" toward the divestiture "has been produced"; and (C) "there are in place binding legal agreements to enable

9

execution of such qualified divestiture during the period of such extension." *Id.* § 2(a)(3).

35.    The Act gives the President authority to determine whether TikTok's buyer is a foreign adversary or controlled by a foreign adversary. *Id.* § 2(g)(6).

36.    ByteDance has stated that it will not sell TikTok, notwithstanding the Act. Aimee Picchi, *After Biden Signs TikTok Ban into Law, ByteDance Says it Won't Sell the Social Media Service,* CBS NEWS, April 26, 2024.[2]

37.    If ByteDance does not sell TikTok, then the Act will effectively shut TikTok down within the United States on January 19, 2025.

**Purported Justifications for the Act**

38.    One justification federal legislators have advanced for the Act is that TikTok allegedly poses a threat to American national security.

39.    For example, Senate Commerce Committee Chairwoman Maria Cantwell has said that the Act's purpose is to "prevent foreign adversaries from conducting espionage, surveillance, maligned

---

[2] https://www.cbsnews.com/news/tiktok-bytedance-says-it-wont-sell/ (last accessed May 24, 2024)

operations, harming vulnerable Americans, our servicemen and women, and our U.S. government personnel." Haleluya Hadero, *Senate Passes Bill Forcing TikTok's Parent Company to Sell or Face Ban, Sends to Biden for Signature,* ASSOCIATED PRESS, April 23, 2024.[3]

40.     House Foreign Affairs Committee Chairman Michael McCaul has called TikTok "a spy balloon in Americans' phones," which can "surveil and exploit America's personal information." Cristiano Lima-Strong and Taylor Telford, *House Passes Potential TikTok Ban that Could Speed Through Senate,* THE WASHINGTON POST, April 20, 2024.[4]

41.     Another ostensible justification for the Act is that TikTok pushes propaganda.

42.     For example, Representative Mike Flood stated that TikTok "has been used as a tool of propaganda in our country." *Press Release,* MIKE FLOOD, March 13, 2024.[5] And Senator Marco Rubio stated that "[t]he Marxist bias on TikTok reflects more than left-wing thought among

---

[3] https://apnews.com/article/tiktok-ban-congress-bill-1c48466df82f3684bd6eb21e61ebcb8d (last accessed May 27, 2024)
[4] https://www.washingtonpost.com/technology/2024/04/20/tiktok-ban-vote-house-passes/ (last accessed May 27, 2024)
[5] https://flood.house.gov/media/press-releases/congressman-flood-votes-stop-tiktok-propaganda (last accessed May 27, 2024)

millennials and Generation Z. It reflects the app's subservience to the world's most powerful Marxist regime: the Chinese Communist Party." Marco Rubio, *Pro-Hamas TikTok Videos Hint at a Broader Chinese Influence Campaign,* WASHINGTON EXAMINER, Nov. 10, 2023.[6]

43.     The Office of the Director of National Intelligence has further alleged that "TikTok accounts run by a PRC propaganda arm reportedly targeted candidates from both political parties during the U.S. midterm election cycle in 2022." Mallory Culhane, *The Chinese Government is Using TikTok to Meddle in Elections, ODNI Says,* POLITICO, March 11, 2024.[7]

44.     In addition, some have alleged that TikTok censors content on issues on which the Chinese government is particularly sensitive, such as Tiananmen Square, Tibetan independence, and Falun Gong. Alex Hern, *Revealed: How TikTok Censors Videos that do not Please Beijing,* THE GUARDIAN, Sept. 25, 2019.[8]

---

[6] https://www.washingtonexaminer.com/opinion/beltway-confidential/2779399/pro-hamas-tiktok-videos-hint-at-a-broader-chinese-influence-campaign/ (last accessed May 27, 2024).
[7] https://www.politico.com/news/2024/03/11/china-is-using-tiktok-for-influence-campaigns-odni-says-00146336 (last accessed May 27, 2024)
[8] https://www.theguardian.com/technology/2019/sep/25/revealed-how-tiktok-censors-videos-that-do-not-please-beijing (last accessed May 27, 2024)

45.     The purported justifications for the ban based on TikTok's alleged use for propaganda reveal that the Act exists to punish TikTok for its editorial decisions and thus imposes a content-based restriction on speech.

## CLAIMS FOR RELIEF

## COUNT ONE

### The Act violates the First Amendment of the United States Constitution.

46.     Petitioner incorporates the preceding paragraphs by reference.

47.     The Act regulates speech by effectively banning a medium of communication—TikTok—that Petitioner uses to engage in protected political speech.

48.     Petitioner's speech on TikTok is core speech protected by the First Amendment.

49.     The Act constitutes a prior restraint on speech by prohibiting U.S. internet hosting services from hosting speech published on TikTok.

50.     The Act constitutes a prior restraint on speech by prohibiting app stores and others from making TikTok available within the United States, thus preventing TikTok from publishing that speech to people within the United States.

51.     The Act constitutes a prior restraint on speech by empowering the President to pre-approve TikTok's buyer—and therefore TikTok's next editor—and thus determine the type (content) of speech that will be published on TikTok.

52.     As a prior restraint, the Act carries "a 'heavy presumption' against its constitutional validity." *Organization for a Better Austin v. Keefe,* 402 U.S. 415, 419 (1971) (quoting *Carroll v. Princess Anne,* 393 U.S. 175, 181 (1968)).

53.     By forcing ByteDance to either sell TikTok to an approved buyer or shut it down within the U.S., the Act burdens Petitioner's free-speech rights by prohibiting Petitioner from publishing its videos to its audience.

54.     The Act also prohibits Petitioner from publishing on its chosen platform *through that platform's chosen editor*—and through the algorithm that currently delivers Petitioner's speech to its audience.

14

55.     The Act violates the First Amendment because it is overbroad: it bans all speech communicated on TikTok, even though all, or almost all, of it is speech protected by the First Amendment that the government has no legitimate interest in censoring.

56.     Purported concerns about national security and protecting Americans from propaganda cannot justify banning TikTok.

57.     Although the government of the People's Republic of China might represent a threat to United States national security, there is no evidence to support allegations that TikTok threatens national security.

58.     To the extent that TikTok could be shown to pose a threat to national security, the Act's ban on all speech on TikTok is not narrowly tailored to serve the government's interest in addressing that threat.

59.     Thus, even if national security is a compelling government interest, the Act's ban on TikTok in its current form is not narrowly tailored to serve that interest, and national security therefore cannot justify the Act's infringement of First Amendment rights.

60.     Further, the suppression of "propaganda"—that is, censorship of speech based on its political content—is not a legitimate government

interest, let alone a compelling one, and cannot justify the Act's infringement of First Amendment rights.

## PRAYER FOR RELIEF

WHEREFORE, Petitioner respectfully requests that this Court:

A.    Grant this Petition for Review;

B.    Declare the Act invalid because it violates Petitioner's First Amendment right to freedom of speech;

C.    Enjoin Respondent from enforcing the Act;

D.    Enter a judgment in favor of Petitioner; and

E.    Award Petitioner any and all other relief the Court deems just and proper.

Dated: June 6, 2024

Respectfully submitted,

**LIBERTY JUSTICE CENTER**

By:  /s/ Jacob Huebert

Jacob Huebert
Jeffrey Schwab
James McQuaid
LIBERTY JUSTICE CENTER
13341 W. U.S. Highway 290
Building 2
Austin, Texas 78737
(512) 481-4400
jhuebert@ljc.org
jschwab@ljc.org
jmcquaid@ljc.org

Attorneys for Petitioner
BASED Politics Inc.

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

| | |
|---|---|
| BASED POLITICS INC., | |
| Petitioner, | |
| v. | No. 24-1183 |
| MERRICK GARLAND, *in his official capacity as Attorney General of the United States*, | |
| Respondent. | |

## CORPORATE DISCLOSURE STATEMENT

Petitioners state as follows:

BASED Politics Inc. is a Georgia 501(c)(3) nonprofit corporation.

BASED Politics Inc. has no parent corporation, and no publicly held

corporation owns 10% or more of its stock.

/s/ Jacob Huebert
Jacob Huebert

*Attorney for Petitioner*

# CERTIFICATE OF SERVICE

I hereby certify that on June 6, 2024, I caused copies of the foregoing

Petition for Review and Corporate Disclosure Statement to be served on

Respondent by mail to the following address:

Merrick B. Garland
Attorney General of the United States
U.S. Department of Justice
950 Pennsylvania Avenue, NW
Washington, DC 20530

/s/ Jacob Huebert
Jacob Huebert

*Attorney for Petitioner*

# Exhibit

# 1

H. R. 815—61

Fusion Development Strategy programs of the People's Republic of China, including the following:

(1) A brief summary of each such identified field and its relevance to the military power and national security of the People's Republic of China.

(2) The implications for the national security of the United States as a result of the leadership or dominance by the People's Republic of China in each such identified field and associated supply chains.

(3) The identification of at least 10 entities domiciled in, controlled by, or directed by the People's Republic of China (including any subsidiaries of such entity), involved in each such identified field, and an assessment of, with respect to each such entity, the following:

(A) Whether the entity has procured components from any known United States suppliers.

(B) Whether any United States technology imported by the entity is controlled under United States regulations.

(C) Whether United States capital is invested in the entity, either through known direct investment or passive investment flows.

(D) Whether the entity has any connection to the People's Liberation Army, the Military-Civil Fusion program of the People's Republic of China, or any other state-sponsored initiatives of the People's Republic of China to support the development of national champions.

(c) APPROPRIATE CONGRESSIONAL COMMITTEES DEFINED.—In this section, the term "appropriate congressional committees" means—

(1) the Committee on Foreign Affairs of the House of Representatives;

(2) the Committee on Armed Services of the House of Representatives;

(3) the Committee on Foreign Relations of the Senate; and

(4) the Committee on Armed Services of the Senate.

# DIVISION H—PROTECTING AMERICANS FROM FOREIGN ADVERSARY CONTROLLED APPLICATIONS ACT

### SEC. 1. SHORT TITLE.

This division may be cited as the "Protecting Americans from Foreign Adversary Controlled Applications Act".

### SEC. 2. PROHIBITION OF FOREIGN ADVERSARY CONTROLLED APPLICATIONS.

(a) IN GENERAL.—

(1) PROHIBITION OF FOREIGN ADVERSARY CONTROLLED APPLICATIONS.—It shall be unlawful for an entity to distribute, maintain, or update (or enable the distribution, maintenance, or updating of) a foreign adversary controlled application by carrying out, within the land or maritime borders of the United States, any of the following:

H. R. 815—62

(A) Providing services to distribute, maintain, or update such foreign adversary controlled application (including any source code of such application) by means of a marketplace (including an online mobile application store) through which users within the land or maritime borders of the United States may access, maintain, or update such application.

(B) Providing internet hosting services to enable the distribution, maintenance, or updating of such foreign adversary controlled application for users within the land or maritime borders of the United States.

(2) APPLICABILITY.—Subject to paragraph (3), this subsection shall apply—

(A) in the case of an application that satisfies the definition of a foreign adversary controlled application pursuant to subsection (g)(3)(A), beginning on the date that is 270 days after the date of the enactment of this division; and

(B) in the case of an application that satisfies the definition of a foreign adversary controlled application pursuant to subsection (g)(3)(B), beginning on the date that is 270 days after the date of the relevant determination of the President under such subsection.

(3) EXTENSION.—With respect to a foreign adversary controlled application, the President may grant a 1-time extension of not more than 90 days with respect to the date on which this subsection would otherwise apply to such application pursuant to paragraph (2), if the President certifies to Congress that—

(A) a path to executing a qualified divestiture has been identified with respect to such application;

(B) evidence of significant progress toward executing such qualified divestiture has been produced with respect to such application; and

(C) there are in place the relevant binding legal agreements to enable execution of such qualified divestiture during the period of such extension.

(b) DATA AND INFORMATION PORTABILITY TO ALTERNATIVE APPLICATIONS.—Before the date on which a prohibition under subsection (a) applies to a foreign adversary controlled application, the entity that owns or controls such application shall provide, upon request by a user of such application within the land or maritime borders of United States, to such user all the available data related to the account of such user with respect to such application. Such data shall be provided in a machine readable format and shall include any data maintained by such application with respect to the account of such user, including content (including posts, photos, and videos) and all other account information.

(c) EXEMPTIONS.—

(1) EXEMPTIONS FOR QUALIFIED DIVESTITURES.—Subsection (a)—

(A) does not apply to a foreign adversary controlled application with respect to which a qualified divestiture is executed before the date on which a prohibition under subsection (a) would begin to apply to such application; and

H. R. 815—63

(B) shall cease to apply in the case of a foreign adversary controlled application with respect to which a qualified divestiture is executed after the date on which a prohibition under subsection (a) applies to such application.

(2) EXEMPTIONS FOR CERTAIN NECESSARY SERVICES.—Subsections (a) and (b) do not apply to services provided with respect to a foreign adversary controlled application that are necessary for an entity to attain compliance with such subsections.

(d) ENFORCEMENT.—

(1) CIVIL PENALTIES.—

(A) FOREIGN ADVERSARY CONTROLLED APPLICATION VIOLATIONS.—An entity that violates subsection (a) shall be subject to pay a civil penalty in an amount not to exceed the amount that results from multiplying $5,000 by the number of users within the land or maritime borders of the United States determined to have accessed, maintained, or updated a foreign adversary controlled application as a result of such violation.

(B) DATA AND INFORMATION VIOLATIONS.—An entity that violates subsection (b) shall be subject to pay a civil penalty in an amount not to exceed the amount that results from multiplying $500 by the number of users within the land or maritime borders of the United States affected by such violation.

(2) ACTIONS BY ATTORNEY GENERAL.—The Attorney General—

(A) shall conduct investigations related to potential violations of subsection (a) or (b), and, if such an investigation results in a determination that a violation has occurred, the Attorney General shall pursue enforcement under paragraph (1); and

(B) may bring an action in an appropriate district court of the United States for appropriate relief, including civil penalties under paragraph (1) or declaratory and injunctive relief.

(e) SEVERABILITY.—

(1) IN GENERAL.—If any provision of this section or the application of this section to any person or circumstance is held invalid, the invalidity shall not affect the other provisions or applications of this section that can be given effect without the invalid provision or application.

(2) SUBSEQUENT DETERMINATIONS.—If the application of any provision of this section is held invalid with respect to a foreign adversary controlled application that satisfies the definition of such term pursuant to subsection (g)(3)(A), such invalidity shall not affect or preclude the application of the same provision of this section to such foreign adversary controlled application by means of a subsequent determination pursuant to subsection (g)(3)(B).

(f) RULE OF CONSTRUCTION.—Nothing in this division may be construed—

(1) to authorize the Attorney General to pursue enforcement, under this section, other than enforcement of subsection (a) or (b);

H. R. 815—64

(2) to authorize the Attorney General to pursue enforcement, under this section, against an individual user of a foreign adversary controlled application; or

(3) except as expressly provided herein, to alter or affect any other authority provided by or established under another provision of Federal law.

(g) DEFINITIONS.—In this section:

(1) CONTROLLED BY A FOREIGN ADVERSARY.—The term "controlled by a foreign adversary" means, with respect to a covered company or other entity, that such company or other entity is—

(A) a foreign person that is domiciled in, is headquartered in, has its principal place of business in, or is organized under the laws of a foreign adversary country;

(B) an entity with respect to which a foreign person or combination of foreign persons described in subparagraph (A) directly or indirectly own at least a 20 percent stake; or

(C) a person subject to the direction or control of a foreign person or entity described in subparagraph (A) or (B).

(2) COVERED COMPANY.—

(A) IN GENERAL.—The term "covered company" means an entity that operates, directly or indirectly (including through a parent company, subsidiary, or affiliate), a website, desktop application, mobile application, or augmented or immersive technology application that—

(i) permits a user to create an account or profile to generate, share, and view text, images, videos, real-time communications, or similar content;

(ii) has more than 1,000,000 monthly active users with respect to at least 2 of the 3 months preceding the date on which a relevant determination of the President is made pursuant to paragraph (3)(B);

(iii) enables 1 or more users to generate or distribute content that can be viewed by other users of the website, desktop application, mobile application, or augmented or immersive technology application; and

(iv) enables 1 or more users to view content generated by other users of the website, desktop application, mobile application, or augmented or immersive technology application.

(B) EXCLUSION.—The term "covered company" does not include an entity that operates a website, desktop application, mobile application, or augmented or immersive technology application whose primary purpose is to allow users to post product reviews, business reviews, or travel information and reviews.

(3) FOREIGN ADVERSARY CONTROLLED APPLICATION.—The term "foreign adversary controlled application" means a website, desktop application, mobile application, or augmented or immersive technology application that is operated, directly or indirectly (including through a parent company, subsidiary, or affiliate), by—

(A) any of—

(i) ByteDance, Ltd.;

H. R. 815—65

(ii) TikTok;

(iii) a subsidiary of or a successor to an entity identified in clause (i) or (ii) that is controlled by a foreign adversary; or

(iv) an entity owned or controlled, directly or indirectly, by an entity identified in clause (i), (ii), or (iii); or

(B) a covered company that—

(i) is controlled by a foreign adversary; and

(ii) that is determined by the President to present a significant threat to the national security of the United States following the issuance of—

(I) a public notice proposing such determination; and

(II) a public report to Congress, submitted not less than 30 days before such determination, describing the specific national security concern involved and containing a classified annex and a description of what assets would need to be divested to execute a qualified divestiture.

(4) Foreign adversary country.—The term "foreign adversary country" means a country specified in section 4872(d)(2) of title 10, United States Code.

(5) Internet hosting service.—The term "internet hosting service" means a service through which storage and computing resources are provided to an individual or organization for the accommodation and maintenance of 1 or more websites or online services, and which may include file hosting, domain name server hosting, cloud hosting, and virtual private server hosting.

(6) Qualified divestiture.—The term "qualified divestiture" means a divestiture or similar transaction that—

(A) the President determines, through an interagency process, would result in the relevant foreign adversary controlled application no longer being controlled by a foreign adversary; and

(B) the President determines, through an interagency process, precludes the establishment or maintenance of any operational relationship between the United States operations of the relevant foreign adversary controlled application and any formerly affiliated entities that are controlled by a foreign adversary, including any cooperation with respect to the operation of a content recommendation algorithm or an agreement with respect to data sharing.

(7) Source code.—The term "source code" means the combination of text and other characters comprising the content, both viewable and nonviewable, of a software application, including any publishing language, programming language, protocol, or functional content, as well as any successor languages or protocols.

(8) United states.—The term "United States" includes the territories of the United States.

**SEC. 3. JUDICIAL REVIEW.**

(a) Right of Action.—A petition for review challenging this division or any action, finding, or determination under this division

H. R. 815—66

may be filed only in the United States Court of Appeals for the District of Columbia Circuit.

(b) EXCLUSIVE JURISDICTION.—The United States Court of Appeals for the District of Columbia Circuit shall have exclusive jurisdiction over any challenge to this division or any action, finding, or determination under this division.

(c) STATUTE OF LIMITATIONS.—A challenge may only be brought—

(1) in the case of a challenge to this division, not later than 165 days after the date of the enactment of this division; and

(2) in the case of a challenge to any action, finding, or determination under this division, not later than 90 days after the date of such action, finding, or determination.

# DIVISION I—PROTECTING AMERICANS' DATA FROM FOREIGN ADVERSARIES ACT OF 2024

**SEC. 1. SHORT TITLE.**

This division may be cited as the "Protecting Americans' Data from Foreign Adversaries Act of 2024".

**SEC. 2. PROHIBITION ON TRANSFER OF PERSONALLY IDENTIFIABLE SENSITIVE DATA OF UNITED STATES INDIVIDUALS TO FOREIGN ADVERSARIES.**

(a) PROHIBITION.—It shall be unlawful for a data broker to sell, license, rent, trade, transfer, release, disclose, provide access to, or otherwise make available personally identifiable sensitive data of a United States individual to—

(1) any foreign adversary country; or

(2) any entity that is controlled by a foreign adversary.

(b) ENFORCEMENT BY FEDERAL TRADE COMMISSION.—

(1) UNFAIR OR DECEPTIVE ACTS OR PRACTICES.—A violation of this section shall be treated as a violation of a rule defining an unfair or a deceptive act or practice under section 18(a)(1)(B) of the Federal Trade Commission Act (15 U.S.C. 57a(a)(1)(B)).

(2) POWERS OF COMMISSION.—

(A) IN GENERAL.—The Commission shall enforce this section in the same manner, by the same means, and with the same jurisdiction, powers, and duties as though all applicable terms and provisions of the Federal Trade Commission Act (15 U.S.C. 41 et seq.) were incorporated into and made a part of this section.

(B) PRIVILEGES AND IMMUNITIES.—Any person who violates this section shall be subject to the penalties and entitled to the privileges and immunities provided in the Federal Trade Commission Act.

(3) AUTHORITY PRESERVED.—Nothing in this section may be construed to limit the authority of the Commission under any other provision of law.

(c) DEFINITIONS.—In this section:

(1) COMMISSION.—The term "Commission" means the Federal Trade Commission.