ORAL ARGUMENT SCHEDULED FOR SEPTEMBER 16, 2024
No. 24-1183 (and consolidated cases)

―――――――――――――――――――――――――――――――――

UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

―――――――――――――――――――――――――――――――――

BASED POLITICS, INC.,
*Petitioner,*

v.

MERRICK B. GARLAND, in his official capacity as Attorney General of
the United States,
*Respondent.*

―――――――――――――――――――――――――――――――――
*caption continued on inside cover*
―――――――――――――――――――――――――――――――――

On Petitions for Review of Constitutionality of the Protecting
Americans from Foreign Adversary Controlled Applications Act

―――――――――――――――――――――――――――――――――

REPLY BRIEF OF PETITIONER BASED POLITICS, Inc.

―――――――――――――――――――――――――――――――――

Jacob Huebert
Jeffrey M. Schwab
James McQuaid
LIBERTY JUSTICE CENTER
7500 Rialto Blvd.
Suite 1-250
Austin, TX 78735
512-481-4400
jhuebert@libertyjusticecenter.org
jschwab@libertyjusticecenter.org
jmcquaid@libertyjusticecenter.org
*Counsel for Petitioners*

BRIAN FIREBAUGH, et al.,
*Petitioners,*

v.

MERRICK B. GARLAND, in his official capacity as Attorney General of
the United States,
*Respondent.*

_____

TIKTOK INC. and BYTEDANCE LTD.,
*Petitioners*

v.

MERRICK B. GARLAND, in his official capacity as Attorney General of
the United States,
*Respondent*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ..........................................................................

INTRODUCTION ....................................................................................1

ARGUMENT .........................................................................................1

    I.    The Act warrants the highest First Amendment scrutiny. ........1

        A. The Act imposes a prior restraint on Petitioner and all
           others who publish speech on TikTok. ...................................1

        B. The Act imposes a total ban on a means of communication...5

        C. The Act warrants strict scrutiny because it imposes a
           content-based restriction on speech....................................8

    II.    The Act fails First Amendment scrutiny. .................................11

CONCLUSION......................................................................................18

CERTIFICATE OF COMPLIANCE ........................................................20

CERTIFICATE OF SERVICE ...............................................................21

# TABLE OF AUTHORITIES

## Cases

*Ambach v. Norwick*,
    441 U.S. 68 (1979)................................................................13

*Acara v. Cloud*
    478 U.S. 697 (1986).......................................................15, 16

*Bluman v. FEC*,
    800 F. Supp. 2d 281 (D.D.C. 2011) .................................13, 14

*Cabell v. Chavez-Salido*,
    454 U.S. 432 (1982)...............................................................13

*City of Ladue v. Gilleo*,
    512 U.S. 43, 56 (1994) .............................................3, 5, 6, 7

*Grosjean v. Am. Press Co.*,
    297 U.S. 233 (1936).............................................................2, 3, 8

*Lamont v. Postmaster General*,
    381 U.S. 301 (1965)...............................................................11

*Minneapolis Star & Trib. Co. v. Minn. Comm'r of Rev.*,
    460 U.S. 575 (1983)................................................................ 8

*Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*,
    429 U.S. 274 (1977)...............................................................14

*Near v. Minnesota*,
    283 U.S. 697 (1931)................................................................ 2

*N.Y. Times Co. v. United States*,
    403 U.S. 713 (1971)...............................................................18

*Reed v. Town of Gilbert*,
    576 U.S. 155 (2015)................................................................ 9

*Southeastern Promotions, Ltd. v. Conrad*,
    420 U.S. 546 (1975)..............................................................3, 4

*Thomas v. Chi. Park Dist.*,
    534 U.S. 316 (2020)................................................................ 4

iv

*U.S. WeChat Users All. v. Trump*,
   488 F. Supp. 3d 912 (N.D. Cal. 2020) .................................................. 4

*Ward v. Rock Against Racism*,
   491 U.S. 781 (1989)............................................................................... 9

*W. Va. Bd. of Educ. v. Barnette*, 319 U.S. 624 (1943),
   319 U.S. 624 (1943)..............................................................................11

## Statutes

Pub. L. No. 118-50, div. H (2024)...........................................................15

   319 U.S. 624, 642 (1943).

## Article

Sheila Chiang, *Temu Accused of Data Risks After Sister App Was
   Suspended for Malware*, CNBC (May 26, 2023)..................................17

## INTRODUCTION

In its response brief, the government tries to portray the Act as a national-security measure aimed at a foreign government, with only an "incidental" effect on speech.

But the Act's effects on speech are not "incidental." The Act is *nothing but* a restriction on speech—and not the speech of a foreign government, but the speech of the 170 million Americans who use TikTok to express and hear ideas on politics and countless other topics. The Act is thus not just *a* restriction on speech but one of the *most sweeping* attempts to shut down a means of communication in our country's history.

Such an unprecedented restriction on Americans' speech warrants the greatest First Amendment scrutiny and cannot survive it.

## ARGUMENT

## I.    The Act warrants the highest First Amendment scrutiny.

### A.    The Act imposes a prior restraint on the speech of Petitioner and all others who publish speech on TikTok.

As Petitioners have argued in their opening briefs, the Act warrants the greatest First Amendment scrutiny because it imposes a prior

restraint on speech by permanently shutting down *all* future speech on TikTok. *See* Creators Br. 38-42; BASED Politics Br. 15-16.

The government tries to downplay this point by burying its response on a single page deep in its brief, making only the most cursory arguments. Govt. Br. 79. But the government cannot escape the nature of the ban that it has enacted and the constitutional consequences that follow, and none of its arguments on this point have merit.

The government claims that the Act does not impose a prior restraint because it "does not contemplate an injunction against speech like the provision invalidated in *Near v. Minnesota ex rel. Olson*, 283 U.S. 697 (1931), but rather after-the-fact enforcement in the form of civil penalties or an injunction against the non-speech activities that the Act actually prohibits." Govt. Br. 79. But Petitioner does not face the prospect of "after-the-fact" punishment for publishing videos on TikTok; Petitioner faces the prospect of not being able to publish on TikTok in the first place. And a prior restraint need not take the form of an injunction; the Supreme Court has noted that *Near* "was careful not to limit the protection of the right [to be free of prior restraints on publication] to any particular way of abridging it." *Grosjean v. Am.*

*Press Co.*, 297 U.S. 233, 249 (1936) (striking down a tax on publications with a circulation of more than 20,000 as a means of restraining speech).

The government also asserts that, if the Act imposes a prior restraint, then so does "any time, place, and manner restriction . . . to the extent that it categorically prohibit[s] speech in a particular location." Govt. Br. 79. But a categorical ban on a particular means of communication does *not* "merely shift the time, place, or manner of its use." *City of Ladue v. Gilleo*, 512 U.S. 43, 56 (1994). Thus, in *City of Ladue*, the Supreme Court did not analyze a ban on signs on residential properties as a time, place, and manner restriction but, as discussed below, simply deemed it unconstitutional—even forgoing the usual levels-of-scrutiny analysis—because it completely prohibited a unique and "important medium of speech." *Id.* at 56; *id.* at 59-60 (O'Connor, J., concurring) (noting that the Court had not applied the usual analysis). In *Southeastern Promotions, Ltd. v. Conrad*, 420 U.S. 546, 556 (1975), the Court held that a city government's exclusion of a particular play from a municipal theater constituted an impermissible prior restraint regardless of whether other forums were available. "Whether petitioner

3

might have used some other, privately owned, [forum] . . . [was] of no consequence . . . . Even if a privately owned forum had been available, that fact alone would not justify an otherwise impermissible prior restraint. '[One] is not to have the exercise of his liberty of expression in appropriate places abridged on the plead that it may be exercised in some other place.'" *Id. See also U.S. WeChat Users All. v. Trump*, 488 F. Supp. 3d 912, 926 (N.D. Cal. 2020) (finding merit in argument that ban on Chinese WeChat app was "equivalent" of a prior restraint on speech).

Finally, the government notes that prior restraints are problematic "because they raise the specter that officials will exercise 'unconfined authority to pass judgment on the content of speech' as a means of stifling disfavored speech or speakers," and asserts the Act "presents no such concern." Govt. Br. 49 (quoting *Thomas v. Chi. Park Dist.*, 534 U.S. 316, 320 (2002)). But of course the Supreme Court's recognition of the threat posed by case-by-case restraints on speech does not imply that blanket bans on speech—against all users of singled-out medium—are any better. Indeed, as discussed below, the Supreme Court has disapproved of such broad bans.

## B.    The Act imposes a total ban on a means of communication.

The Supreme Court has deemed a complete ban on a means of communication to violate the First Amendment. In *City of Ladue*, it did so without even resorting to any particular level of constitutional scrutiny. 512 U.S. at 56; *id.* at 59-60 (O'Connor, J., concurring) (noting that the Court had not applied the usual scrutiny). The government calls Petitioners' reliance on this case "misguided" because *Ladue* said that signs on residential properties "carrie[d] a message quite distinct from" alternative means of communication, but TikTok users (supposedly) could communicate just as well through videos on other platforms. Govt. Br. 64-65. In fact, *Ladue* identified many characteristics of residential signs that made them unique and rendered a ban on them unconstitutional, and nearly all those characteristics have an analog here.

*Ladue* recognized that the city had "almost completely foreclosed a venerable means of communication that is both unique and important," and "totally foreclosed that medium to political, religious, or personal messages." 512 U.S. at 54. Here, similarly, the Act forecloses all communication on TikTok—which is indeed a unique forum, for reasons

Petitioners and amici have explained. Creators Br. 28-30; BASED Politics Br. 3-9. Other platforms *might* provide an alternative, but the government has not established that any of them *do*, and its suggestion that adequate substitutes *would* replace TikTok if the Act takes effect is speculative.

*Ladue* observed that "[r]esidential signs are an unusually cheap and convenient form of communication," and that "persons of modest means or limited mobility . . . may have no particular substitute." 512 U.S. at 57. Of course that is even more true of TikTok: anyone with access to a phone or computer can use it to broadcast speech to the world for free. Other apps might allow people to record or publish videos, but not of the exact same character, not to the same audience, and not with the same potential for a large audience. *See* Creators Br. 28-30; BASED Politics Br. 3-9.

*Ladue* further observed that, "[e]ven for the affluent," methods of political communication other than residential signs—such as "taking out a newspaper advertisement, handing out leaflets on the street, or standing in front of one's house with a hand-held sign"—could be too costly "in money or time," so that the ability to post residential signs

6

could "make the difference between participating and not participating in some public debate." *Id.* at 57. So, too, with TikTok: it is obvious that posting videos can be much less costly and cumbersome, and much more effective, than traditional means of political communication.

*Ladue* also noted that signs at one's residence are "often intend[ed] to reach *neighbors*, an audience that could not be reached nearly as well by other means." *Id.* It is the same with TikTok—except, instead of reaching neighbors, one can reach an audience interested in one's ideas across the country and around the world, possibly reaching millions as Petitioner sometimes does. Indeed, it is much easier to think of alternative ways to communicate with one's neighbors (e.g., talking to them) than to think of alternative ways to reach the particular worldwide audience now available on TikTok (because none exist). In this way, TikTok is an even more uniquely valuable means of communication than a yard sign—and its abolition would be at least as severe of an infringement of First Amendment rights.

Thus, if the sign ban in *City of Ladue* suppressed "too much speech" based on these factors, 512 U.S. at 55, then so does the Act's ban on TikTok.

**C.    The Act warrants strict scrutiny because it imposes a content-based restriction on speech.**

In addition, and in the alternative, the Act warrants strict scrutiny because it is a content-based restriction on speech.

The government argues that the Act is content-neutral because it neither singles out particular subject matter for censorship nor requires platforms to engage in any particular content moderation. Govt. Br. 66-67. But the Supreme Court has long recognized that facially neutral statutes can impose content-based restrictions on speech if they were enacted with an improper motive. For example, in *Grosjean*, the Court struck down a tax on publications with a circulation of more than 20,000, apparently based in part on its understanding that the tax was designed to penalize certain newspapers critical of the government. *See Grosjean*, 297 U.S. at 250 (describing the tax as a "deliberate and calculated device in the guise of a tax to limit the circulation of information"); *Minneapolis Star & Trib. Co. v. Minn. Comm'r of Rev.*, 460 U.S. 575, 580 (1983) (noting that "the result in *Grosjean* may have been attributable in part to the perception on the part of the Court that the State imposed the tax with an intent to penalize a selected group of newspapers").

And the Supreme Court's recent jurisprudence on content-based speech restrictions makes clear that a restriction on speech can be content-based if it *either* expressly (facially) treats speech differently based on its content *or* is facially neutral but has a content-based purpose or motivation. *Reed v. Town of Gilbert*, 576 U.S. 155, 166-67 (2015); *see also Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989) (for facially neutral law restricting speech, "[t]he government's purpose is the controlling consideration"). To determine whether facially content-neutral restrictions are content-based, courts consider "whether the government had regulated speech because of disagreement with its message, and whether the regulation was justified without reference to the content of the speech." *Reed*, 576 U.S. at 167 (marks omitted).

This case presents (at least)[1] the latter situation: the law's obvious purpose is to suppress speech based on its content. That purpose is apparent from statements by the legislators who sponsored and voted for it. *See* TikTok Br. 19-21; Creators Br. 16-17; Br. of Cato Inst. as Amicus Curiae 10-11. The government tries to dismiss these as

---

[1] As Petitioner argued in its initial brief, the Act also imposes a content-based restriction on its face. *See* BASED Politics Br. 18-19.

"scattered statements" by "fewer than a handful of Congressmen," Govt Br. at 70-71, but they provide the best evidence of the Act's purpose, given the statute's lack of any stated purpose or findings.

And those legislators' statements are not the only evidence that the statute's purpose is to suppress speech based on its content. The government also *says so repeatedly in its brief* as one of its proffered justifications for the Act. The government says it must ban TikTok because of its potential for "[c]overt content manipulation"—that is, "shap[ing] *the content that the application delivers* to American audiences" to promote speech that would "undermine trust in our democracy and exacerbate social divisions" and influence "the views of Americans" in a way that supposedly would pose a "grave threat to national security." Govt. Br. at 35-36 (emphasis added). The government also cites its concern for "manipulating this country's public discourse and public perception of events" and "shap[ing] the content Americans see." Govt. Br. at 38.

True, the government's argument here, unlike the legislators' statements, does not identify specific ideas that the government would like to suppress. But it makes clear that the government seeks to shut

down TikTok because it wants to suppress *whatever* ideas (including speech by Americans) that TikTok might promote that would serve the Chinese government's interests.

## II.     The Act fails strict First Amendment scrutiny.

The government offers two "national security" rationales for the ban: prevention of collection of Americans' data that could be shared with the Chinese government; and preventing TikTok from promoting content that serves the Chinese government's interests. *See* Govt. Br 27-49.

The second aim—limiting Americans' exposure to speech that serves the Chinese government's interests—is not a legitimate basis for suppressing the speech of Americans who use the platform. The suppression of speech based on its content, especially to stop the spread of ideas the government deems dangerous, is antithetical to the First Amendment and wholly illegitimate. *See, e.g., W.V. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 642 (1943).

Even if the suppressed speech consisted entirely of propaganda from a foreign adversary, the First Amendment would protect it, as shown in *Lamont v. Postmaster General*, 381 U.S. 301 (1965), which struck down

11

a statute that required the Postmaster General to detain mail deemed
to be "communist political propaganda" unless the addressee returned a
card from the post office asking to receive it. The government says
*Lamont* "bear[s] no resemblance to this case" because the Act leaves
foreign entities free to disseminate their views "in any forum other than
the platform that has given rise to nation-security risks in light of its
ownership." Govt. Br. 78. That argument is circular, however, given the
government's argument that TikTok presents "national-security risks"
*based on* its potential for use as a propaganda tool. And *Lamont* did not
say that the government may shut down one means of distributing
communist propaganda if it leaves others open; it simply held that, by
interfering with individuals' ability to obtain protected literature, the
statute was "at war with the 'uninhibited, robust, and wide-open' debate
and discussion that are contemplated by the First Amendment." 381
U.S. at 307.

Besides, the speech the Act suppresses is largely *not* propaganda
from or supporting a foreign adversary; it is the speech of Americans
like Petitioner, who have nothing to do with the Chinese government
and often espouse ideas (such as support for free markets and civil

liberties) whose expression the Chinese government might dislike. The U.S. government has no legitimate interest in suppressing this speech simply because the Chinese government *might* someday be able to amplify some speech on the platform to serve its own interests.

The government attempts to justify its deliberate suppression of speech by claiming it is entitled to exclude foreign citizens from "basic governmental processes," including the democratic process. Govt. Br. 36 (quoting *Cabell v. Chavez-Salido*, 454 U.S. 432, 439 (1982)). But the Supreme Court precedents that the government cites for this point only approve of excluding non-citizens from government employment; they do not address or endorse any censorship of speech. *See id.* (upholding citizenship requirement for California peace officers); *Ambach v. Norwick*, 441 U.S. 68 (1979) (upholding citizenship requirement for public-school teaching jobs). A district court opinion that the government cites did uphold a federal campaign finance law banning contributions and certain expenditures by foreign nationals, *Bluman v. FEC*, 800 F. Supp. 2d 281, 287 (D.D.C. 2011). Govt. Br. 36. But of course the government generally may regulate campaign spending in ways that it cannot regulate other speech, and that decision made clear that

13

its reasoning would not restrain foreign nationals from "speaking out about issues or spending money to advocate their views about issues." *Id.* at 290. And, in this case, the government is not prohibiting discrete acts of campaign spending or election speech by a foreign national; it is suppressing the speech of millions of *Americans* out of concern that a foreign government might someday exert its influence over the platform's (private) owner, in some currently unknown way, to affect the reach of some TikTok videos.

The government's other stated aim—preventing the collection of Americans' personal data by an entity that might have to share it with the Chinese government—appears more legitimate on its face. But that rationale cannot suffice, given the government's other illegitimate purpose, unless it is clear that Congress "would have reached the same decision" even without the illegitimate rationale, *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977), which the government has not done.

Moreover, putting that aside, the Act is so grossly underinclusive that it is not narrowly tailored to serve the government's asserted data-

14

security interest and casts great doubt on whether the government is seeking to serve that interest at all.

The government argues that the Act is simply about shutting down apps that compromise Americans' data and national security, and that the Act's effect on speech is incidental—comparing it to a city's (permissible) forced closing of an adult bookstore under an law that allowed it to shut down any business that facilitates prostitution. Govt Br. 62 (citing *Acara v. Cloud Books, Inc.*, 478 U.S. 697, 706-07 (1986)).

Here, however, the Act does *not* broadly ban apps that could share particular types of data with a foreign adversary—and does not just happen to apply to an app used for speech in this instance. Instead, the Act targets *only* TikTok and other platforms that allow users to "generate, share, and view text, images video, real-time communications, or similar content," Act § (g)(2)(A)(1), excluding platforms with 1,000,000 or fewer monthly active users and applications "whose primary purpose is to post product reviews, business reviews, or travel information and reviews." *Id.* §§ 2(g)(2)(A)(ii), 2(g)(2)(B), 3(A). Thus, the Act is not like the ordinance in *Acara*; rather, it is like an ordinance authorizing a city to close *only*

15

*bookstores but not other businesses* based on their facilitation of prostitution, which *would* present a First Amendment problem. *See Acara*, 487 U.S. at 705 (noting that the ordinance did not "single out bookstores or others engaged in First Amendment protected activities for the imposition of its burden").

The government fails to explain the Act's singling out of speech platforms—except by reference to the government's interest in suppressing speech. The government claims that it exempted platforms that allow users to post only reviews about products, businesses, or travel because those apps "would not share the unique attributes of dynamic platforms" or have the "particular susceptibilities that arise from the manner that users interact and engage with" the platforms banned by the Act. But the government cites no evidentiary support for these vague assertions, and it does not deny that review apps, shopping apps, or other apps could give the Chinese government access to Americans' data—including their locations and much else—just as TikTok supposedly does.

There is, of course, an obvious explanation for the government's singling out of speech platforms: the government's real concern is

suppressing speech on TikTok that it doesn't like, particularly political speech. That is not merely a suspicion: it's what the Act's supporters said, and it's what the government says in much of its brief. Expert observers have also noted that the government has pursued a ban on TikTok, but not on Chinese shopping apps that pose similar data concerns, precisely because of the social media platforms' "content influence." *See* Sheila Chiang, *Temu Accused of Data Risks After Sister App Was Suspended for Malware*, CNBC (May 26, 2023).[2]

Further, it is difficult to find the government's national security concerns credible when both the sitting Vice President of the United States[3] and the previous President of the United States[4], who also sought to ban the platform, have TikTok accounts.

As for the government's proffered evidence, it mostly consists of several declarations from government officials, government reports, and articles from publications such as *Forbes* and *Buzzfeed News*—none of which can satisfy the government's burden in the absence of evidentiary

---

[2] https://www.cnbc.com/2023/05/17/temu-accused-of-data-risks-amid-tiktok-pinduoduo-fears.html.

[3] https://www.tiktok.com/@kamalaharris

[4] https://www.tiktok.com/@realdonaldtrump

testing, regardless of what they assert. And, in any event, none of the government's evidence satisfies the "direct, immediate, and irreparable" standard that would allow the suppression of speech on national-security grounds under *N.Y. Times Co. v. United States*, 403 U.S. 713, 730 (1971) (Stewart, J., concurring); *id.* at 726-27 (Brennan, J., concurring). At best, the government's evidence identifies actions the Chinese government *might* someday take to influence TikTok and the speech it promotes, which is not enough. Thus, the government has not satisfied its burden to justify its unprecedented content-based infringement on First Amendment rights.

## CONCLUSION

For these reasons, the reasons in Petitioner's opening briefs, and the reasons stated in the other Petitioners' briefs, the Court should issue a permanent injunction against the Act's enforcement—or, to the extent there are evidentiary issues to resolve, a preliminary injunction to prevent the Act's enforcement until this Court enters judgment.

DATED: August 15, 2024

/s/ Jacob H. Huebert
Jacob Huebert
Jeffrey M. Schwab
James McQuaid
LIBERTY JUSTICE CENTER
7500 Rialto Blvd.
Suite 1-250
Austin, TX 78735
512-481-4400
jhuebert@libertyjusticecenter.org
jschwab@libertyjusticecenter.org
jmcquaid@libertyjusticecenter.org

19

## CERTIFICATE OF COMPLIANCE

1. This brief complies with the type-volume limitations set by the Court's order of May 28, 2024 because the brief contains 3,473 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed R. App. P. 32(a)(6) because this brief has been prepared in Microsoft Word using proportionally spaced, 14-point Century Schoolbook font.

August 15, 2024

/s/ Jacob H. Huebert
LIBERTY JUSTICE CENTER
7500 Rialto Blvd.
Suite 1-250
Austin, TX 78735
512-481-4400
jhuebert@libertyjusticecenter.org

*Counsel for Petitioner*
*BASED Politics, Inc.*

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the District of Columbia Circuit by using the appellate CM/ECF system on August 15, 2024.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

August 15, 2024

/s/ Jacob H. Huebert
LIBERTY JUSTICE CENTER
7500 Rialto Blvd.
Suite 1-250
Austin, TX 78735
512-481-4400
jhuebert@libertyjusticecenter.org

*Counsel for Petitioner
BASED Politics, Inc.*

21